UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

DEMARIO MOYE,

                  Petitioner,

    -vs-

MICHAEL CORCORAN, Superintendent,
Cayuga Correctional Facility,

              Respondent.
_____

**DECISION AND ORDER**
**No. 05-CV-0391(VEB)**

## I.     Introduction

*Pro se* petitioner DeMario Moye ("Moye" or "petitioner") has filed a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 challenging the constitutionality of his custody resulting from a judgment convicting him, following a jury trial in Erie County Court, of attempted assault in the first degree and criminal possession of a weapon in the second degree.

The parties have consented to disposition of this matter by a magistrate judge pursuant to 28 U.S.C. § 636(c)(1).

## II.     Factual Background and Procedural History

.  Moye originally was indicted on five criminal counts: attempted murder (N.Y. Penal Law ("P.L.") §§ 110.00, 125.25), attempted assault in the first degree (P.L. §§ 110.00, 120.10(1)), criminal possession of a weapon in the second degree (P.L. § 265.03(2)), and two counts of endangering the welfare of a child (P.L. § 260.10(1).  The charges stemmed from Moye's shooting of Robert Staples ("Staples" or "the victim") on August 22, 2001, while Staples was sitting on his porch with his fiancee, Elizabeth Moore ("Moore"), and their twin sons.

Moore and Staples testified that at about 6:30 p.m., petitioner rode up on his bicycle, stopped on the street directly in front of the porch, directed an epithet at Staples and challenged Staples to a fight. T.51-54, 71-75.[1] Staples recognized petitioner from previous occasions on which petitioner had stared at him from inside a passing car. T.77-78. Staples began to unbutton his shirt and said, "give me a minute, I'm going to walk up to the corner, whatever you want to do we can do it when we get to the corner, just let me get my kids out of the way." T.80-81. Staples then told Moore to take the children inside the house. T.82.

Staples' fiancee, Moore, testified that Staples responded to petitioner's threat by saying "I don't even know you," and suggesting that he and petitioner "go down to the corner and talk about this." T.55. Moore asked, "Is this all over a girl?" T.82. Petitioner answered, "No," and directed the same epithet at Staples and insisted that he knew Staples. T.82-83.

Moore testified that petitioner, still seated on his bike, then pulled out a gun and shot at Staples. T.56-57. Moore grabbed the children and ran into the house, where she heard two more shots. T.57. Staples testified that as he started to come down off the porch, Moore grabbed the twins and went into the house, at which point petitioner pulled a small black revolver from his back pocket area and fired it straight at Staples. T.83-85, 102-103. Staples immediately ran into the house and slammed the door. T.85-87. Petitioner then rode away on his bicycle. T.87.

With respect to motive, Staples testified that defendant might have been angry because Staples had sex several times with a girl named "Net" from Guilford Street. T.89-90. Staples also said that he had been offered money on more than five occasions to "walk away" from the case. T.90-92. On one occasion, petitioner's brother offered the money and on another occasion,

_____

[1]        Citations to "T.___" refer to the trial transcript.

petitioner's brother was present when money was offered to Staples. T.92-93.

Other prosecution witnesses included Thomas Hall, who testified that about a week before the shooting, petitioner had approached him and asked whether Staples was Hall's cousin. T.112-13. Theresa Gilliam, who lived next door to Staples and Moore, was an eyewitness to the shooting. She saw Staples arguing with an individual on a bicycle who subsequently shot a gun at Staples and rode away. T.116-18.

Finally, the prosecution called several police witnesses. Officers Kevin Kennedy and Thomas McCarthy responded to a call of shots fired where they found that Staples' house had recently been hit by a round of gunfire. T.128-29, 172-74. After obtaining a description of the shooter, the officers named petitioner as the primary suspect. T.125, 132, 174. The next day, as Officers Kennedy and McCarthy were driving to petitioner's house to arrest him and en route, they drove past an individual on a bicycle whom they thought was petitioner. T.133, 175-76. When they drove by petitioner's house, they observed the bicycle, but did not see petitioner. T.134, 177. Five to ten minutes later, the officers returned to petitioner's house; he was at home and they arrested him. T.134-35, 177-78.

According to the officers, petitioner appeared "nervous," "excited," and "agitated." T.139. He was talking "a lot" and asking numerous questions. T.139. In particular, petitioner informed the officers that he had a "minor beef" with a person named "Rob," whom defendant caught in bed having sex with petitioner's girlfriend, "Antoinette." T.140, 182. Petitioner admitted this during his testimony at trial. However, according to petitioner, he would not have shot "Rob" over the incident because it was not a "big deal," given that "everybody fucks everybody else's chick." T.140. Petitioner also told the police that he had injured his foot playing

basketball. T.146-47, 184-85. He mentioned that he had "run-ins" with law enforcement in Florida, and asked the police whether there would be a plea deal available if he were to disclose the location of the gun used in the shooting. T.148. Petitioner questioned why the police had not arrested him when they drove by him earlier while he was on his bicycle. T.141-42, 182.

Petitioner subsequently gave a written statement to Detective Gary Teague. In the statement, petitioner related that on the night of the shooting, he had been playing basketball with his brother and cousin from 3:30 p.m. until he hurt his foot, then he sat on his grandmother's porch until 1:00 a.m. *See* T.160-67. During that time, petitioner claimed he was talking with relatives and "playing numbers". T.167. Petitioner denied owning a bicycle or a handgun. T.167. He admitted that he had a "problem" with someone named Robert, but claimed that it was not Robert Staples. He also stated that the problem was not big enough to be a "killing problem". T.167-68.

The defense presented several alibi witnesses. Petitioner's sister Taneisha Neely testified that said that she was with petitioner on the porch from 5:30 p.m. until 8:00 p.m. T.212-13. Torrie Carmichael, a cousin of petitioner, testified that he thought he was with petitioner on the day of the shooting, but he was unable to say for certain. T.238-41. Fredericka Moye, also a cousin of defendant, testified she was in petitioner's company from 5:45 p.m. until 9:00 p.m. T.267.

Petitioner testified in his own behalf consistently with his written statement to police that he was talking with his friends and shooting basketball from 3:30 p.m. until 4:30 or 5:30 p.m. T.289-91. From that time until 1 a.m., petitioner testified, he was hanging out on the porch of his grandmother's house. T.291. Petitioner claimed that he had sustained an injury to his foot which

-4-

prevented him from riding a bicycle. T.299. Petitioner acknowledged that he found

someone named Robert in bed with his girlfriend Antoinette, but denied that it was Staples.

T.297-98, 303-05.

The jury returned a verdict convicting petitioner of attempted first degree assault. Moye

was sentenced to concurrent determinate prison terms of eight years each on the attempted

assault and criminal possession convictions, to be followed by five years of post-release

supervision.

On direct appeal to the Appellate Division, Fourth Department, petitioner was

represented by new appellate counsel, who argued that all of his statements to the police were

involuntary, that he did not voluntarily waive his rights under *Miranda v. Arizona*, 384 U.S. 436

(1966); that trial counsel provided less than meaningful representation, that the verdicts were

based on insufficient evidence and were against the weight of the evidence, that the defense was

entitled to a missing witness instruction as to Larry Harrison, and that the sentence was unduly

harsh and severe. Petitioner's conviction was unanimously affirmed. *People v. Moye*, 11 A.D.3d

1027 (App. Div. 4th Dept. 2004). The New York Court of Appeals denied leave on December 31,

2004. *People v. Moye*, 4 N.Y.3d 746 (N.Y. 2004).

In his timely-filed habeas petition, petitioner has asserted the following four claims for

relief: (1) the failure to suppress his oral and written statements was erroneous; (2) trial counsel

provided ineffective assistance; (3) the evidence was legally insufficient to support either

conviction; and (4) the trial court erroneously denied the request for a missing witness charge.

Respondent answered the petition, asserting the affirmative defense of procedural default

with regard to petitioner's challenge to the legal sufficiency of the evidence. Respondent argues

that, in any event, none of Moye's claims merit habeas relief.

For the reasons that follow, I find that a writ of habeas corpus is not warranted and Moye's ppetition is dismissed.

### III.    General Legal Principles Applicable to Section 2254 Petitions

Under the Anti-Terrorism and Effective Death Penalty Act ("AEDPA"), a federal court may grant habeas relief to a state prisoner only if a state court conviction "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d)(1), or if it "was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding." *Id.* § 2254(d)(2). A state court decision is "contrary to" clearly established federal law "if the state court arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law or if the state court decides a case differently than [the Supreme Court] has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 413, 120 S.Ct. 1495, 1523 (2000); *accord Harris v. Kuhlmann*, 346 F.3d 330, 342 (2d Cir.2003); *Clark v. Stinson*, 214 F.3d 315, 320 (2d Cir.2000). The phrase, "clearly established Federal law, as determined by the Supreme Court of the United States," limits the law governing a habeas petitioner's claims to the holdings (not *dicta*) of the Supreme Court existing at the time of the relevant state-court decision. *Williams*, 529 U.S. at 412; *accord Sevencan v. Herbert*, 342 F.3d 69, 73-74 (2d Cir. 2002), *cert. denied*, 540 U.S. 1197 (2004).

A state court decision is based on an "unreasonable application" of Supreme Court precedent if it correctly identified the governing legal rule, but applied it in an unreasonable manner to the facts of a particular case. *Williams*, 529 U.S. at 413. The inquiry for a federal

habeas court is not whether the state court's application of the governing law was erroneous or incorrect, but rather whether it was "objectively unreasonable." *See id.* at 408-10; *accord Eze v. Senkowski*, 321 F.3d 110, 125 (2d Cir.2003); *Aparicio v. Artuz*, 269 F.3d 78, 94 (2d Cir.2001) ("[A] federal habeas court is not empowered to grant the writ just because, in its independent judgment, it would have decided the federal law question differently. The state court's application must reflect some additional increment of incorrectness such that it may be said to be unreasonable.").

Under AEDPA, "a determination of a factual issue made by a State court shall be presumed to be correct. The [petitioner] shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1); *see also Parsad v. Greiner*, 337 F.3d 175, 181 (2d Cir.) ("The presumption of correctness is particularly important when reviewing the trial court's assessment of witness credibility."), *cert. denied sub nom. Parsad v. Fischer*, 540 U.S. 1091, 124 S.Ct. 962 (2003). The Supreme Court has explained that Section 2254(e)(1) means that a state court's findings "will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding." *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003).

## IV.    Analysis of the Claims Raised in the Petition

### A.    Failure to suppress petitioner's oral and written statements to the police (Ground One of the Petition)

#### 1.    The suppression hearing

Trial counsel requested a pre-trial hearing pursuant to *People v. Huntley* to determine whether petitioner had been read his *Miranda* warnings, whether he had waived his constitutional

rights, and whether he had invoked his right to counsel. The *Huntley* hearing motion did not raise the issue of whether petitioner's oral statements to the arresting were involuntary.

At the *Huntley* hearing, the proof indicated that on the day of his arrest, petitioner was sitting on his porch, talking on a telephone. The police approached him and asked for his name. H.19.[2] When petitioner provided his name, the officers directed him to hang up the phone and put his hands behind his back because he was under arrest for attempted murder. H.19. According to the police officers, they did not read petitioner the Miranda warnings because they did not intend to question him; their only task was to transport petitioner to police headquarters for interrogation by detectives from a specialized unit. H 21-22.

According to the arresting officers, petitioner was "agitated and excited" and started asking the police questions. H.20. He inquired as to how he could be charged with murder, to which the police replied that a "complaint had been lodged" and that people sometimes lodge complaints if they "have a beef with somebody in particular." H.25. The police told petitioner to think about whether he had a "beef" with anyone, said that he should direct all questions to the detective in charge of his case. H.23, 25.

Petitioner apparently continued to make oral statements to the arresting officers. He volunteered that he had "a minor beef with a guy named Rob who he had caught in bed with his girlfriend." However, he told the officers that he "didn't think it was a major beef because everybody fucks everybody else's girlfriend." H.25-26. Petitioner also asked why the officers had not arrested him earlier when they saw him riding his bicycle. H.26.

---

[2]    Citations to "H.__" refer to the transcript of the pre-trial suppression hearing held pursuant to *People v. Huntley*.

Upon petitioner's arrival at the police station, he was asked by Detective Gary Teague to read the *Miranda* warnings rights aloud from a pre-printed card. H.28. Petitioner was asked to, and did, sign and date the card. Petitioner told the detective that he understood his rights and that he wished to talk to the police. H.28-29. One of the arresting officers mentioned that it "might go a long way with the District Attorney or the Judge" if petitioner told the police the location of the gun used in the shooting. H.30, 34. Petitioner did not disclose this information. He stated that he had injured his foot playing basketball and was going to go to the hospital at around the time the police showed up to arrest him. H.56. At no time during the interrogation did petitioner request medical attention or ask to be taken to the hospital. H.57.

Later on, petitioner agreed to give a written statement, which was transcribed contemporaneously as he related it to the officers. H.67. After the statement was completed, petitioner was given an opportunity to review it and make changes and in fact made a minor change. H.63-65. The officers testified that petitioner was given some water and afforded an opportunity to use the restroom while he was at the police station. H.65. They testified that nobody involved in the arrest or station-house interrogation of defendant made any promises or coerced defendant into making statements. H.58, 65, 68-69.

At the close of the suppression hearing, trial counsel stated that "[w]ith regard to the signed statement by [petitioner] no objection to that being put into evidence," H.69, and asserted, "I would just submit that the evidence submitted to the Court speaks for itself." *Id.* He did not make a specific argument directed to the admissibility of petitioner's *oral* statements. On direct appeal, however, appellate counsel contended that, given the "totality of the circumstances," petitioner's oral and written statements were involuntary, and that the *Miranda*

waiver was not knowing and voluntary because (1) he was too young (he was 19-years-old); (2) the police were armed and accusatory from the outset; (3) he was suffering a painful foot injury; (4) he was upset; (5) the police used deceptive strategies by stating at the time of petitioner's arrest that a "complaint" had been filed, and (6) the police made an implied promise when they stated, after reading him the *Miranda* warnings, that he could help himself out if he disclosed the location of the gun that he used in the shooting.

The People, on direct appeal, argued that based on the delineation of issues in the *Huntley* hearing request and the arguments made by trial counsel at the hearing, petitioner failed to preserve his arguments that his written statement was both involuntary and preceded by an allegedly invalid waiver of *Miranda* rights, and that his oral statements were involuntary. To the extent there was any preservation issue, the Appellate Division did not refer to it specifically in the decision and order affirming Moye's conviction.

> We reject the contention of defendant that Supreme Court erred in refusing to suppress his written statements. Defendant's written statements were made after defendant received *Miranda* warnings, and the record establishes that defendant voluntarily waived his *Miranda* rights (*see People v. Witherspoon*, 66 N.Y.2d 973, 973-974, 498 N.Y.S.2d 789, 489 N.E.2d 758).
> . . .
> We have reviewed defendant's remaining contentions and conclude that they are without merit.

*People v. Moye*, 11 A.D.3d at 1027-28. Respondent has treated the Appellate Division's reference to "remaining contentions" as encompassing all of the other arguments made on direct appeal concerning his statements to the police, besides *Miranda*-related claims it specifically addressed on the merits earlier in the order. As the Appellate Division found that these "remaining contentions" were "without merit", respondent has treated this as an adjudication on

the merits. *See Jimenez v. Walker*, 458 F.3d 130, 146 (2d Cir. 2006) (citing *Fama v. Commissioner of Corr. Servs.*, 235 F.3d 804, 810-11 (2d Cir. 2000) (deeming an "either/or" decision–i.e., that the state court's rejection of a federal claim as "either unpreserved for appellate review or without merit" –to rest on the merits of the federal claim because there was no "plain statement" to the contrary). For the reasons discussed below, the Appellate Division did not unreasonably apply clearly established Supreme Court precedent in determining that all of Moye's statements to the police were admissible.

## 2. The pre-*Miranda* oral statements

First, I turn to the admissibility of the pre-*Miranda*, oral statements to the arresting police officers. The Supreme Court's "concern . . . in *Miranda* was that the 'interrogation environment' created by the interplay of interrogation and custody would 'subjugate the individual to the will of his examiner' and thereby undermine the privilege against compulsory self-incrimination." *Rhode Island v. Innis*, 446 U.S. 291, 298 (1980) (quoting *Miranda*, 384 U.S. at 457-58. Thus "[a] suspect is entitled to *Miranda* warnings only if he or she is *interrogated* while '*in custody.*'" *Parsad v. Greiner*, 337 F.3d 175, 181 (2d Cir. 2003) (quoting *Thompson v. Keohane*, 516 U.S. 99, 102 (1995) (emphases supplied)); *see also Illinois v. Perkins*, 496 U.S. 292, 297, 110 S.Ct. 2394, 110 L.Ed.2d 243 (1990). Clearly, Moye was "in custody" when he made the oral statements, since he had already been told by the police officers that he was under arrest for attempted murder. *E.g.*, *Berkemer v. McCarty*, 468 U.S. 420, 434 (1984) ("There can be no question that [the accused] was 'in custody' at least as of the moment he was formally placed under arrest and instructed to get into the police car."). "In its *Miranda* opinion, the [Supreme] Court concluded that in the context of 'custodial interrogation' certain procedural safeguards are

-11-

necessary to protect a defendant's Fifth and Fourteenth Amendment privilege against compulsory self-incrimination. More specifically, the [Supreme] Court held that 'the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination.'" *Rhode Island v. Innis*, 446 U.S. 291, 297 (1980) (quoting *Miranda*, 384 U.S. at 444).

The question is whether Moye was subjected to "interrogation" while in custody, which has been defined by the Supreme Court express questioning initiated by law enforcement officers or its "functional equivalent." *Rhode Island v. Innis*, 446 U.S. at 300-01; *see also Oregon v. Elstad*, 429 U.S. 492, 494 (1977) ("'By custodial interrogation, we mean questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way.'") (quoting *Miranda*, 384 U.S. at 444). However, the Supreme Court has emphasized that not all statements obtained by the police after a person has been taken into custody are to be considered the product of interrogation, *Innis*, 446 U.S. at 299; rather, "[v]olunteered statements of any kind are not barred by the Fifth Amendment and their admissibility is not affected by [its] holding . . . ." *Miranda*, 384 U.S. at 478; *accord Innis*, 446 U.S. at 300. "'Interrogation,' as conceptualized in the *Miranda* opinion, must reflect a measure of compulsion above and beyond that inherent in custody itself." *Innis*, 446 U.S. at 300.

The "functional equivalent" of express questioning includes "any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Id.* at 301 (footnotes omitted). Thus, a "practice that the police should know is reasonably likely to

-12-

evoke an incriminating response from a suspect . . . amounts to interrogation," but because the police "cannot be held accountable for the unforeseeable results of their words or actions, the definition of interrogation can extend only to words or actions on the part of police officers that they should have known were reasonably likely to elicit an incriminating response." *Id.* Although Moye was in custody when he made his oral statements, the record does not indicate that any of those statements were solicited by the police, or that the police acted in a manner that should reasonably have been anticipated to evoke an incriminating response from Moye. The record does not support Moye's argument that his oral statements were the product of either direct or subtle police interrogation or maneuvering. Rather, it appears that his oral statements were self-generating and spontaneous, and that he apparently kept talking after the police officers told him to direct any questions he had to the detective in charge of the investigation. On the present record, I find that the state courts did not unreasonably apply clearly established Supreme Court precedent in admitting Moye's pre-*Miranda* oral statements to the police, as the state courts reasonably could have concluded that the statements were spontaneous and that the post-arrest actions of the police officers did not constitute the functional equivalent of interrogation. *See Rhode Island v. Innis*, 446 U.S. at 300-02.

### 3.     The post-*Miranda* written statement

As noted above, once petitioner arrived at the police statement, he was given a pre-printed card from which he read his *Miranda* rights aloud, agreed to waive them, and signed the card indicating that he understood and was waiving his rights.  Moye then gave a written statement to the police. On direct appeal, the Appellate Division held that "[d]efendant's written statements were made after defendant received *Miranda* warnings, and the record establishes that

defendant voluntarily waived his *Miranda* rights[.]" *People v. Moye*, 11 A.D. at 1027 (citing *People v. Witherspoon*, 66 N.Y.2d 973, 973-974 (N.Y. 1985)). The Appellate Division did not specifically address Moye's contentions that his waiver and statement were involuntary because he was too young, that the police were armed and accusatory, that he was suffering a painful foot injury, that he was upset; that the police used deceptive strategies by stating at the time of petitioner's arrest that a "complaint" had been filed, and that the police made an implied promise when they stated, after reading him the *Miranda* warnings, it might be beneficial if he revealed the location of the gun used in the shooting.

The relinquishment of the rights conveyed by the *Miranda* warnings must be "voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion or deception[,]" and it must be "made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Moran v. Burbine*, 475 U.S. 412, 421 (1986). "Only if the 'totality of the circumstances surrounding the interrogation' reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the Miranda rights have been waived." *Moran*, 475 U.S. at 421 (quoting *Fare v. Michael C.*, 442 U.S. 707, 725 (1979) and citing *North Carolina v. Butler*, 441 U.S. 369, 374-75 (1979)); *accord, e.g.*, *Green v. Scully*, 850 F.2d 894, 901 (2d Cir.1988); *see also Lynumn v. Illinois*, 372 U.S. 528, 534 (1963) (a confession is not voluntary when obtained under circumstances that overbear the defendant's will at the time it is given). The factors to be considered include the characteristics of the accused, including his experience, background, age, education, and intelligence, and the conditions of interrogation, including police conduct, length of detention, whether the questioning was repeated or prolonged, physical abuse, handcuff

restraints, the deprivation of food or sleep, and psychologically coercive tactics. *Green v. Scully*, 850 F.2d at 901-2; *see also Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973); *United States v. Anderson*, 929 F.2d 96,99 (2d Cir. 1991).

The record does not support Moye's contention that his age, alleged foot injury, or "agitated" emotional state made his waiver or his subsequent written statement to the police less than voluntary. At nineteen years old, Moye was no longer considered a "juvenile"; he was legally an adult and was of sufficient age and intelligence to make a knowing and intelligent decision regarding whether to talk to the police. The claim that his foot injury was significant is undermined by the fact that he did not ask for medical treatment during the interview. By his admission, had been living with the injured foot for "a good six days", People's *Huntley* Hearing Exhibit No. 6, and had played basketball and ridden a bicycle before he was arrested. The record supports the conclusion that the questioning was not done in a hostile environment and that Moye was not subjected to rigorous interrogation. Moye agreed to waive his rights and cooperate soon after arriving at the police station. To the extent that the police officer's statement that petitioner might benefit himself by providing the location of the gun was an implied promise of leniency, the Second Circuit has held that "a confession is not involuntary merely because the suspect was promised leniency if he cooperated with law enforcement officials[,]" *United States v. Guarno*, 819 F.2d 28, 31 (2d Cir. 1987) (citations omitted). Here, although petitioner decided to cooperate, he did not disclose the location of the gun during his interview, casting doubt on what effect, if any, that statement had on him.

Given the record in this case, "the characteristics of the [petitioner] and the conduct of the law enforcement officials do not otherwise suggest that [petitioner] could not freely and

independently decide whether to cooperate or remain silent," *Guarno*, 819 F.2d at 31. "[T]he record is devoid of any suggestion that police resorted to physical or psychological pressure to elicit the statements," *Moran v. Burbine*, 475 U.S. at 421, nor was Moye "worn down by improper interrogation tactics or lengthy questioning or by trickery or deceit," *Fare v. Michael C.*,442 U.S. at 726-27, or "intimidate[d] or threaten[ed]," *id.*, by the police. In sum, the totality of the circumstances establishes that Moye's written statement was made of his own free will after a knowing and voluntary waiver of his constitutional rights and was not coerced by the conduct of law enforcement officials. Therefore, this claim for federal habeas relief is denied.

**B.  Legal insufficiency of the evidence supporting both convictions (attempted assault and criminal possession of a weapon) (Ground Three of Petition)**

On direct appeal, Moye's appellate counsel argued that the evidence was legally insufficient to convict petitioner of either attempted assault or criminal possession of a weapon. Although counsel's brief challenged the evidence supporting both convictions, the Appellate Division only referred to a singular "conviction" in its decision:

> Defendant concedes that he failed to preserve for our review his contention that the evidence is legally insufficient to support the conviction [sic] (*see People v. Gray*, 86 N.Y.2d 10, 19, 629 N.Y.S.2d 173, 652 N.E.2d 919 ([N.Y. 1995]) ("[E]ven where a motion to dismiss for insufficient evidence was made, the preservation requirement compels that the argument be 'specifically directed' at the alleged error [in the People's proof . . . .")]). In any event, that contention lacks merit, and defendant's further contention that the verdict is against the weight of the evidence is similarly lacking in merit (*see generally People v. Bleakley*, 69 N.Y.2d 490, 495, 515 N.Y.S.2d 761, 508 N.E.2d 672 [(1987)]).

*People v. Moye*, 11 A.D.3d 1027, 1028 (App. Div. 4th Dept. 2004). Respondent argues that Moye's claim is procedurally barred due to the Appellate Division's reliance upon People v. Gray, 86 N.Y.2d at 19, as an "adequate and independent state ground," to dismiss Moye's claim

as unpreserved. *See Harris v. Reed*, 489 U.S. 255, 260-61, 264 n.10 (1989) (Federal habeas corpus review of a state conviction is prohibited if a state court judgment is based on an "adequate and independent state ground," such when the state court "explicitly invokes a state procedural bar rule as a separate basis for decision.").

In the interest of judicial economy, I will proceed directly to the merits of Moye's asserted legal-insufficiency claim rather than addressing the procedural bar issue first, as the underlying claim is easily resolved. "[T]he Due Process Clause of the Fourteenth Amendment protects a defendant in a criminal case against conviction 'except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged.' " *Jackson v. Virginia*, 443 U.S. 307, 315 (1979) (quoting *In re Winship*, 397 U.S. 358, 364, 90 S.Ct. 1068, 1073 (1970)). Such an inquiry "does not require a court to 'ask itself whether it believes that the evidence at the trial established guilt beyond a reasonable doubt,' " rather "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* at 318-19 (citations omitted; emphasis in original).

Here, Moye cannot clear the high hurdle facing a habeas petitioner challenging the legal sufficiency of the evidence supporting his conviction. The *Jackson v. Virginia* "standard must be applied with explicit reference to the substantive elements of the criminal offense as defined by state law." *Jackson v. Virginia*, 443 U.S. at 324 n. 16; *accord, e.g.*, *Green v. Abrams*, 984 F.2d 41, 44-45 (2d Cir.1993) ("In considering a petition for a writ of habeas corpus based on insufficient evidence to support a criminal conviction in the state courts, a federal court must look to state law to determine the elements of the crime."). A federal habeas court's "review

under *Winship* is limited to whether the elements so defined have been proven beyond a reasonable doubt." *Ponnapula v. Spitzer*, 297 F.3d 172, 183 (2d Cir. 2002). To convict Moye of attempted first degree assault, the jury was required to find that "with intent to commit a crime, he engage[d] in conduct which tends to effect the commission of such crime," N.Y. PENAL LAW § 110.00, namely, "[w]ith intent to cause serious physical injury to another person, he causes such injury to such person or to a third person by means of a deadly weapon or a dangerous instrument[,]" N.Y. PENAL LAW § 120.10(1). Guilt on the second degree criminal possession count required a finding that Moye "possesse[d] any loaded firearm. . . ." N.Y. PENAL LAW § 265.03(3).

As the Supreme Court has instructed, this Court has reviewed the evidence in the light most favorable to the prosecution, and construed in its favor all permissible inferences arising from the evidence. There was ample evidence, both direct and circumstantial, upon which a rational jury could have found beyond a reasonable doubt that Moye was the person who fired a loaded gun at Staples while he was sitting on his porch, with the intention of seriously injuring him. Moye's arguments concerning the sufficiency of the evidence founder because they are based solely upon attacking the credibility of the witnesses and the weight that should be accorded their testimony. For instance, Moye argues that Staples and Moore were untrustworthy because they used drugs and had criminal histories. Moye also argues that Staples and Moore had the opportunity to concoct the charges against him because they lived together, and even then, they could not get their stories straight about when the children were brought into the house–before or after the shooting. (I note, however, these discrepancies in the end aided Moye in that the jury acquitted him of the child-endangerment charges.)

Questions of witness credibility belong to the fact-finder, and the arguments Moye made on direct appeal and here were already presented to, and resolved by the jury at his trial. *Accord*, *e.g.*, *Garrett v. Perlman*, 438 F. Supp.2d 467, 470 (S.D.N.Y. 2006) ("Petitioner's specific argument in support of this claim, that King's testimony was "incredible," is likewise not reviewable in habeas proceedings since credibility determinations are the province of the jury.") (citing *Maldonado v. Scully*, 86 F.3d 32, 35 (2d Cir. 1996) ("[A]ssessments of the weight of the evidence or the credibility of witnesses are for the jury and not grounds for reversal on [habeas] appeal.")). Neither on direct appeal nor on federal habeas is a court reviewing a sufficiency of the evidence claim permitted to revisit the factfinder's determinations as to the witnesses' credibility and veracity. *E.g.*, *United States v. Strauss*, 999 F.2d 692, 696 (2d Cir.1993) ("[T]he jury is exclusively responsible for determining a witness' credibility.") (citing *United States v. Roman*, 870 F.2d 65, 71 (2d Cir.), *cert. denied*, 490 U.S. 1109 (1989)); *Gruttola v. Hammock*, 639 F.2d 922, 928 (2d Cir.1981) (rejecting insufficient evidence claim raised by habeas petitioner because jury was entitled to believe State's witnesses despite inconsistencies in their testimony and State's evidence); *Huber v. Schriver*, 140 F. Supp.2d 265, 277 (E.D.N.Y.2001) ("[M]ost of petitioner's argument rests on the suggestion that the eyewitness testimony was not credible and should not have been given enough weight to result in his conviction. . . . However, under both the state law . . . and federal law, issues of credibility, as well as the weight to be given to evidence, are questions to be determined by the jury . . . ."). The proof presented at Moye's trial, recited above in this Decision and Order, more than adequately satisfies the due process standard set forth in *Jackson*. Habeas relief accordingly is not warranted on Moye's claims that the attempted first degree assault and second degree weapons-possession convictions were not based

upon legally sufficient evidence.

To the extent that Moye is claiming that the verdicts were against the "weight of the evidence" under *People v. Bleakley*, 69 N.Y.2d 490, 495 (N.Y.1987) (citations omitted), such an argument raised only issues of New York state law and accordingly cannot provide a basis for habeas relief, 28 U.S.C. § 2254(a) (permitting federal habeas corpus review only where the petitioner has alleged that he is in state custody in violation of "the Constitution or a federal law or treaty"). Federal courts routinely dismiss claims attacking a verdict as against the weight of the evidence on the basis that they are not federal constitutional issues cognizable in a habeas proceeding. *Ex parte Craig*, 282 F. 138, 148 (2d Cir.1922) (holding that "a writ of habeas corpus cannot be used to review the weight of evidence . . ."), *aff'd*, 263 U.S. 255 (1923); *accord*, *e.g.*, *Garrett v. Perlman*, 438 F. Supp.2d at 470 (" In making a "weight of the evidence" argument, Petitioner has not asserted a federal claim as required by 28 U.S.C. § 2254(a). Instead, he has raised an error of state law, for which habeas review is not available.") (citation omitted). For the foregoing reasons, Ground Three of the petition is dismissed

### C.     Ineffective assistance of trial counsel (Ground Two of the Petition

#### 1.     The state court's ruling and general legal principles applicable to ineffective assistance claims on federal habeas

Moye claims, as he did on direct appeal, that his trial attorney provided ineffective assistance of counsel in a variety of respects. The Appellate Division held that "contrary to the contention of defendant, he received effective assistance of counsel[.]" *People v. Moye*, 11 A.D.3d at 1027 (citing *People v. Baldi*, 54 N.Y.2d 137, 147 (N.Y. 1981)). The Appellate Division's dismissal constituted an adjudication on the merits of this claim for purposes of

AEDPA review.

To prevail on a claim of ineffective assistance, a habeas petitioner must demonstrate that (1) counsel's performance was deficient, and (2) the deficient performance was prejudicial to the defense. *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *see also Lockhart v. Fretwell*, 506 U.S. 364, 369 (1993). In assessing whether the attorney's performance was deficient, a reviewing court must determine whether his conduct "fell below an objective standard of reasonableness" given the facts and circumstances of the particular case. *Strickland*, 466 U.S. at 688. On habeas review, a federal court must be "highly deferential" and "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689. The reviewing court must consider any purported omissions in light of counsel's overall performance. *Kimmelman v. Morrison*, 477 U.S. 365, 386 (1986).

The "prejudice" prong of the *Strickland* test requires "a showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable," and that "but for" the claimed errors of counsel, the trial result would have been different. 466 U.S. at 687, 694. The Supreme Court has described the reviewing court's inquiry as looking at "whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Id.* at 686.

The Supreme Court's approach in *Strickland* does not require the reviewing court to "determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies." *Strickland*, 466 U.S. at 697; *see also*, *e.g.*, *United States v. Helgesen*, 669 F.2d 69, 71 (2d Cir.1982) ( "An evaluation of ineffective assistance of counsel usually begins with an examination of the strength of the Government's

-21-

case."). Thus, in disposing of ineffective assistance claims, the Second Circuit has often

emphasized the strength of the prosecution's case as a critical factor in finding the accused was

not prejudiced by counsel's performance. *See, e.g.*, *Strouse v. Leonardo*, 928 F.2d 548, 556 (2d

Cir.1990) (court declines to address deficiencies of counsel given overwhelming evidence of

guilt adduced at trial); *United States v. Simmons*, 923 F.2d 934, 956 (2d Cir.1991) ("Given the

plethora of evidence against [appellant], there is little reason to believe that alternative counsel

would have fared any better."); *United States v. Nersesian*, 824 F.2d 1294, 1322 (2d Cir.1987)

(finding that defendant was not prejudiced by trial counsel's errors where evidence of guilt was

overwhelming).

### 2. The alleged error's of petitioner's trial counsel

Moye first contends that counsel was ineffective in failing to make certain arguments

after the pre-trial suppression hearing and a motion for a trial order of dismissal with regard to

the sufficiency of the evidence. He has, however, failed to demonstrate that he was prejudiced by

trial counsel's failure to preserve these claims at the trial level. This is because the Appellate

Division considered the omitted arguments on the merits when they were raised on direct appeal

by Moye's appellate counsel. *See People v. Moye*, 11 A.D.3d at 1027.

With regard to Moye's trial counsel's belated challenge to the racial composition of the

panel of prospective jurors, Moye did not then, nor has he now, made a sufficient showing to

warrant relief on such a motion, and the courts "must allow trial counsel some latitude in

deciding which pretrial motions are called for in a particular case[,]" *United States v. Aulet*, 618

F.2d 182, 189 (2d Cir.1980).

Turning to Moye's contentions about trial counsel's failure to object to evidentiary issues,

he states that trial counsel should have raised an objection to allegedly improper "bolstering" testimony by a police officer witness in violation of the state evidentiary rule announced *People v. Trowbridge*, 305 N.Y. 471, 477, 113 N.E.2d 841 (N.Y. 1953), and alleges that it is reversible error for the trial court to allow the prosecutor to elicit testimony which bolstered the evidence identifying the defendant as the perpetrator. *E.g., People v. Stanley*, 185 A.D.2d 827, 828, 586 N.Y.S.2d 649, 651 (App. Div. 2d Dept. 1992) ("[T]he prosecutor proceeded to repeat the [*Trowbridge*] error by again eliciting testimony from a detective which indicated that, following the lineup viewings [sic], the defendant was arrested. The import of this testimony is clear-the defendant was arrested as a result of the witnesses' identification of him as the perpetrator. This testimony constituted improper, inferential bolstering of the identification testimony, in violation of the *Trowbridge* rule[.]"); *see also Martin v. Garvin*, No. 92 Civ. 3970 (LBS),1993 WL 138813, at *3-*4 (S.D.N.Y. Apr. 23, 1993). *Trowbridge* errors in New York are subject to harmlessness review. *Garvin*, 1993 WL 138813, at *3-*4 (citing *People v. Stanley*, 185 A.D.2d at 828-29 (holding that the *Trowbridge* error of "impermissibl[y] bolstering . . . the identification testimony was harmless", where the People had introduced "'clear and strong' evidence of identification" in the form of "testimony of two eyewitnesses, each of whom not only had an ample opportunity to view the defendant both prior to and at the time of the shooting but who had previously seen the defendant in the vicinity, on repeated occasions, standing on the street in front of a particular club") (quotation omitted).

Here, Moye contends that the prosecutor trod over the *Trowbridge* line when he was questioning one of the police officers whether Staples, the victim, gave certain information to the police–namely, a description of the perpetrator. *See* T.130-32 (Q. Did Mr. Staples provide you

with information that you felt important to pass on to Detective Teague? A. Yes. Not only did he

further bolster the description of the suspect of the initial complaint–"). At that point in the

detective's answer, trial counsel objected to the testimony on hearsay grounds, and the objection

was sustained. The trial court directed that the officer's answer be struck and that the jury

disregard it. However, the trial court then expressly permitted the prosecutor to inquire what the

police did upon receiving the unspecified information from the victim, which was to arrest Moye.

*See* T.132 ("After you spoke with Detective Teague[,] what information did he provide you of a

legal nature [sic] concerning a suspect in the shooting . . . .?"). Trial counsel objected on hearsay

grounds. The trial court ruled that the police officer could testify as to "what did he do after the

information was obtained," and told the prosecutor to ask that question. *Id.* The police officer

answered that he "went looking for the suspect," that is, Moye. *Id.*

Even assuming, *arguendo*, that there was *Trowbridge* error, any further objection by trial

counsel likely would have been futile since the trial court had just expressly ruled that the

prosecutor could inquire into the area of testimony about which Moye now complains. There is

no reasonable probability that trial counsel's failure to object influenced the outcome of the trial

or the direct appeal, as the Appellate Division most likely would have found any error to be

harmless. *Accord Martin v. Garvin*, 1993 WL 138813, at *4 ("Petitioner next claims that trial

counsel was ineffective because he allowed police officers to "bolster" the identifications of him

by the complainants without objection. Specifically, Police Officer Rosa testified that petitioner

was arrested following a lineup viewing by Mr. Gonzalez. The import of this testimony is clear:

the defendant was arrested as a result of the witness' identification of him as the perpetrator. This

testimony constituted improper, inferential bolstering of the identification testimony under New

York law. The question for the Court is whether trial counsel's failure to object to it rendered his legal assistance ineffective under *Strickland*. [The court] conclude[s] that it did not. Under New York law, the admission of this bolstering testimony was, at most, harmless error. Since the admission of this testimony was harmless error, trial counsel's failure to object to it did not prejudice the petitioner. Accordingly, the [habeas] petitioner cannot satisfy the second prong of *Strickland*.") (citing *People v. Echeveria-Brand*, 100 A.D.2d 974, 475 N.Y.S.2d 81, 82 (App. Div. 2d Dept. 1984) (finding that defense attorney's failure to object to admission of detective's bolstering testimony did not constitute ineffective assistance where evidence of identity was "clear and strong"); other internal citation omitted)).

Moye faults counsel for failing to object to an alleged error by the trial court during juror deliberations to the jury's request for readback of testimony. In *People v. O'Rama*, 78 N.Y.2d 270 (N.Y. 1991), the trial judge had refused defense counsel's request to see the jury's deadlock note, the New York Court of Appeals delineated guidelines requiring notice and opportunity to comment on jury inquiries to the court. The facts here differ from those in *O'Rama.* Moye's jury sent a note requesting "police car conversation", to which the trial judge asked the jury to clarify its request, so the jury subsequently submitted a note requesting "Officer Kennedy's testimony" and petitioner's "testimony of the police car ride" T.429, 432-33. The judge told the jury that he was assuming they wanted Officer Kennedy's testimony of the police car ride, and that if the jury wanted more, it could submit an additional note. T.432-33.

Although an *O'Rama* violation does not require the demonstration of prejudice, I do note that as respondent argues in this case, trial counsel could have strategically decided not to request that additional parts of the officer's testimony be read back to the jury since it contained

testimony that was not beneficial to petitioner; for instance, Officer Kennedy had testified that petitioner had been in trouble with the law in Florida; that he tried to cut a deal if he told the police the location of the gun used in the shooting; and that he claimed he was playing the lottery at the time of the shooting, but could not produce a receipt. T.147-48. Even though prejudice is not required under *O'Rama*, automatic reversal for failure to follow the guidelines set forth in that case is required only in circumstances where the jury request raises "important, substantive" issues that critically affect the jury's deliberations. *Id.* at 279-80. Moye has not shown that a successful *O'Rama* objection could have been made in his case.

Petitioner's other argument about trial counsel's alleged deficiencies during jury deliberations is that he was ineffective in failing to recommend that the trial court accept a partial verdict when the jury indicated that it was deadlocked on counts two (attempted assault) through five. *See* T.434-35. By consent of both parties, the jury was sent to dinner and to continue deliberations. T.435. At about 9:30 p.m., the jury indicated by another note as follows" On three counts we agree, on two counts we are eleven to one. The remaining juror is firm on their position." T.437. The trial judge proposed utilizing N.Y. CRIM. PROC. LAW § 310.70(1)(b)(i), which permits acceptance of a partial verdict on some counts and ordering further deliberations on the remaining ones. T.437-38. The trial judge had additional colloquy with counsel; before the jury was addressed regarding this note, it sent another note requesting that the trial court "advise on [their] previous message." T.441. Both the defense and the prosecution agreed to having the judge send the jury home for the night and issue a charge pursuant to *Allen v. United States*, 164 U.S. 492 (1896), in the morning. This procedure was followed. The jury made one final request for legal definitions, and returned their verdicts soon thereafter. T.447-49.

Petitioner contends that trial counsel was ineffective for not recommending that the trial court accept a partial verdict under N.Y. CRIM. PROC. LAW § 310.70(1)(a) because (1) the jury had deliberated for almost 10 hours, and therefore was unlikely to agree on the remaining counts within a "reasonable" amount of time, and (2) allowing the jury to deliberate further after an *Allen* charge "may have deprived [petitioner] of an acquittal on both the attempted assault and criminal possession charges." Petitioner's Appellate Brief on State Direct Appeal at 30, attached as part of Respondent's Exhibits to the Answer. Moye argues that it was "not unreasonable" to believe that the two counts on which the jury was deadlocked were the two counts on which he was convicted; he points to the first note regarding the deadlock situation which indicated that the deadlocked counts were two through five (which included the attempted assault charge, count two). However, the subsequent note, T.437, did not indicate on which of the three counts the jury had reached agreement or on which two counts the jury was deadlocked. Thus, as the prosecutor recognized, T.438, the parties could not determine, with any certainty, what exactly the jurors had decided. For this Court to determine the prejudice actually sustained by Moye as a result of trial counsel's decision appears to require speculation, making habeas relief inappropriate. *See Rosario v. Bennett*, No. 01 Civ. 7142(RMB)(AJP), 2003 WL 151988, at *2 (S.D.N.Y. Jan. 21, 2003) (agreeing that petitioner's assertions that an investigation by his counsel could have revealed exculpatory information was "speculation [that] satisfie[d] neither *Strickland*'s deficient performance nor prejudice prongs") (quoting Report and Recommendation, 2002 WL 31852827, at *33 (S.D.N.Y. Dec. 20, 2002)).

In addition, Moye's accusation against trial counsel seems to present the type of a judgment-call best made through the lens of hindsight. *Cf. McPherson v. Greiner*, No. 02

Civ.2726 DLC AJP, 2003 WL 22405449, at *24 (S.D.N.Y. Oct. 22, 2003)) ("[Petitioner]'s ineffectiveness claim on the partial verdict issue is hard to understand–his trial counsel did object to the partial verdict, but [the trial judge] overruled the defense and prosecution objections and took the partial verdict. Thus, [petitioner]'s ineffective assistance claim that his counsel failed to 'properly' oppose the partial verdict is frivolous, and should be denied.").

Petitioner also contends that counsel was ineffective in failing to object when the prosecutor forced petitioner to characterize a witness who testified at trial as a liar. During the prosecutor's cross-examination of defendant, the following exchange occurred:

> Q. Why were you asking Thomas Hall about Robert Staples [the victim]?
> A. I never asked Thomas Hall about Robert Staples.
> Q. So, his brief testimony here was–he has nothing to do with the case–was untruthful? You never did approach him and ask about Rob?
> A. Never. Never.

T.305. The prosecutor's question to petitioner as to whether the prosecution witness' testimony was untruthful was clearly improper as a matter of state and federal law. However, the question was compound, the prosecutor did not press for an answer to the inappropriate portion of the question, and petitioner was not compelled to answer the inappropriate question. Under these circumstances, trial counsel reasonably could have concluded that an objection would have unnecessarily drawn more attention to the improper inquiry as to petitioner's opinion of Hall's truthfulness.

Next, Moye faults trial counsel for failing to object during the prosecutor's summation to remarks denigrating petitioner's defense theories. Moye contends that trial counsel should have objected when the prosecutor said, "you talk about making stuff up." As respondent points out,

this remark was a fair response to defense counsel's argument that the victim's girlfriend was conspiring with the victim to falsely accuse petitioner because she loved the victim and wanted to help him out. *See* T.347, 358. Petitioner also contends that trial counsel should have objected when the prosecutor argued that his defense of mistaken identity was "ludicrous" because the victims "d[idn't] know the guy" and would not "pick him out of the blue" and "point the finger at him and say he shot at us." T.359. In response to defense counsel's argument that the police were not believable because they had to refresh their recollection with documents and because the prosecutor asked them leading questions on direct examination, *see* T.350, the prosecutor stated that counsel's argument was "ridiculous" because police have many cases, are not able to memorize every case and are allowed to refresh their recollection, *see* T.360. Moye also faults the prosecutor for stating, in regards to petitioner's testimony averring that he was not involved in the shooting that "[h]is only thing [sic] is to deny, deny, deny and that's just what he's doing" in his testimony. T.377.

I note that the Second Circuit and district courts in this Circuit have allowed prosecutors much leeway in their closing arguments. *E.g.*, *United States v. Jaswal*, 47 F.3d 539, 544 (2d Cir.1995) ("Defendant Shahnavazy contends that the prosecutor engaged in prosecutorial misconduct during closing arguments. This contention is also without merit. Shahnavazy disputes the prosecutor's characterization of the defendant's case as a 'fairy tale.' However, '[a] prosecutor is not precluded from vigorous advocacy, or the use of colorful adjectives, in summation.'") (quoting *United States v. Rivera*, 971 F.2d 876, 884 (2d Cir. 1992)). *see also Pineda v. Miller*, No. 03 CV 1344(NG)(MDG), 2006 WL 2239105, at *20 (E.D.N.Y. Aug. 4, 2006) ("[T]he prosecutor's comments regarding the weaknesses in petitioner's defense [we]re

proper responses to the efforts of defense counsel to attack the credibility of the undercovers.")
(citing *United States v. Bautista*, 23 F.3d 726, 733 (2d Cir.1994) ("The government is ordinarily
permitted to respond to arguments impugning the integrity of its case.") (citation omitted));
*United States v. Elias*, 285 F.3d at 190-92 (holding that prosecution comments during summation
that "grossly mis-characterized [the defense's argument] and said that the defense was . . .
insulting [a] battered victim" do not require a new trial when they constitute "an aberration in an
otherwise fair proceeding," the trial judge issued a curative jury instruction and the defendant
"most likely would have been convicted even without the improper remarks"). One habeas court
in this Circuit has noted that a prosecutor's "hyperbolic" characterization of the defense theory as
matching the dictionary definition of "ludicrous" and  "an obvious absurdity" was "problematic
since it was one step removed from calling [petitioner] a liar." *Nkemakolam v. Senkowski*, No.
96-CV-2088 (FB), 1998 WL 388700, *6 (E.D.N.Y. July 7, 1998) (declining to grant habeas relief
because petitioner was not substantially prejudiced) (comparing with *Floyd v. Meachum*, 907
F.3d 347, 353-55 (2d Cir.1990) (granting habeas relief because of the "cumulative effects of the
prosecutor's improper statements," including calling the defendant a liar dozens of times,
equating these lies with proof of guilt, and making references to the Fifth Amendment as a shield
for the innocent and not the guilty)).

      It is, of course, better practice for defense counsel to object to improper comments by the
prosecutor at the time they are made, both to preserve the claims for review and to provide the
trial court an opportunity to issue curative instructions if the objection is sustained.  Even if the
prosecutor "exceed[ed] the broad bounds of rhetorical comment permissible in closing
argument," *People v. Galloway*, 54 N.Y.2d 396, 399, there is no reasonable likelihood, given this

Court's review of the record in Moye's case, that an objection from defense counsel would have altered the outcome of the trial, *see People v. Williams*, 8 N.Y.3d 854 (N.Y. 2007), *aff'g*, 28 A.D.3d 1059, 813 N.Y.S.2d 606 (App. Div. 4th Dept. 2006). The jury returned favorable verdicts on three of the five counts of the indictment, indicating that they made their own credibility determinations, did not just adopt the prosecution's witnesses' version of events wholesale, and heeded the trial court's general instructions that the arguments of counsel were not evidence, *see* T.413-17. Given the favorable verdict returned by the jury with regard to the top count of the indictment charging him with attempted murder, Moye is hard-pressed to show that he was prejudiced by trial counsel's alleged shortcomings or that the legal representation he received throughout the trial was so deficient that his attorney was not functioning within the acceptable professional standards required for counsel. In addition to securing an acquittal on the attempted murder charge, trial counsel also successfully exploited discrepancies in the eyewitnesses' testimony to raise a reasonable doubt concerning whether Moye's discharge of the gun occurred while the victim's children were outside, since the jury returned favorable verdicts on the child-endangerment counts. In sum, there is no reasonable probability that, but for counsel's unprofessional errors, the result of the Moye's criminal proceeding would have been more favorable than that which he received as a result of his counsel's actual performance here. Accordingly, his claim of ineffective assistance of trial counsel is denied in its entirety.

### D. Erroneous denial of a missing witness jury charge (Ground Three of the Petition)

Moye contends that the trial court erroneous denied his request for a "missing witness" jury instruction with regard to Larry Harrison ("Harrison"). The basis for defense counsel's

request was that the prosecutor had referred to Harrison during his opening statement, mentioning that Harrison was someone whom petitioner wanted to lie for him. *See* T.43. However, as a result of a defense motion *in limine* regarding the scope of Harrison's testimony, the trial court determined that the prosecutor would be precluded from asking Harrison about any matters for which the prosecution had not given pre-trial notice, which included the allegation that petitioner had solicited Harrison to lie for him. *See* T.22, 24. (At the time of opening statements, the trial court had not issued a decision on this evidentiary issue.) The trial court also barred testimony from Harrison that Moye had been in possession of the same gun used by Harrison later on in a robbery that he (Harrison) committed with Moye's brother. *See* T.203. Finally, the trial court precluded any testimony that Moye possessed weapons on any day prior to August 22nd, the day of the shooting with which Moye was charged. *See* T.206. Specifically, the trial court ruled that Harrison could not testify on this matter unless he could place petitioner with the gun on the date of the shooting; because Harrison could not provide a specific date, the prosecutor could not call Harrison as a witness. *See* T.206-09.

Later, when discussing jury charges, defense counsel asked the trial court for a missing witness instruction regarding Harrison, noting that "[t]he People did specifically name him in the opening and did state what he would say and he was not called." T.342-43. The prosecution responded that the trial court "precluded us from inquiring into the areas we wanted to explore with Mr. Harrison, so there is no reasonable–I would call him to have him refuse to testify or be unable to inquire into the areas concerning the case." T.343. Trial counsel, in the alternative, did not ask for a limiting instruction concerning the statements of the prosecutor in his opening statement. The trial court denied the defense request for a missing witness instruction. T.343. On

direct appeal, the Appellate Division did not specifically discuss this claim, instead denying it summarily as without merit.

As an initial matter, it bears noting that "federal habeas corpus relief does not lie for errors of state law." *Lewis v. Jeffers*, 497 U.S. 764, 779 (1990) (citations omitted). "[T]he fact that [a jury] instruction was allegedly incorrect under state law is not a basis for habeas relief." *Estelle v. McGuire*, 502 U.S. 62, 72 (1991) (citing *Marshall v. Lonberger*, 459 U.S. 422, 438, n. 6 (1983) ("[T]he Due Process Clause does not permit the federal courts to engage in a finely tuned review of the wisdom of state evidentiary rules")). In determining whether the failure to give a jury instruction warrants habeas relief, the reviewing court must determine that the petitioner was entitled to the requested charge under state law, that the failure to give one resulted in a denial of his federal constitutional right due process, and that the state court's contrary conclusion constituted an unreasonable application of clear Supreme Court law. *Jackson v. Edwards*, 404 F.3d 612, 621 (2d Cir. 2005) (citing 28 U.S.C. § 2254(d)).

Determining that a petitioner was entitled to a particular instruction "under state law is the first step in determin[ing] whether that error violated the petitioner's federal due process rights." *Henderson* at 123-24. Under New York law, the initial burden for a missing witness charge rests on the party requesting the charge, who must demonstrate that the uncalled witness is knowledgeable about a material issue, that the witness would testify favorably to the opposing party, and that the opposing party has failed to call the witness to testify. *People v. Gonzalez*, 68 N.Y.2d 424, 427, 509 N.Y.S.2d 796, 799 (1986). Upon such a showing, the burden shifts to the opposing party to demonstrate either "that the witness is not knowledgeable about the issue, that the issue is not material or relevant, that although the issue is material or relevant, the testimony

would be cumulative [of] other evidence, that the witness is not 'available,' or that the witness is not under the party's 'control' such that the witness would not be expected to testify" in favor of the opposing party. *Id.* at 428. The availability of a witness is a separate and distinct consideration from control over that witness; "availability" simply refers to the party's physical ability to produce the witness. *Id.* at 428. "[I]f a witness, although theoretically 'available' to both sides, is favorable to or under the influence of one party and hostile to the other, the witness is said to be in the 'control' of the party to whom he is favorably disposed, and an unfavorable inference may be drawn from the failure to call the witness." *Id.* at 429.

Here, as discussed at length above, trial counsel obtained a favorable evidentiary ruling–the preclusion of Harrison's testimony regarding petitioner's alleged possession of a gun. However, during the course of the ruling the trial court determined that Harrison (the missing witness) was "not knowledgeable about the issue," *People v. Gonzalez*, *supra*, of when petitioner possessed the gun. This had the effect of defeating one of the elements of the missing witness charge. Thus, Moye has not demonstrated that the state trial court erred in determining that he was not entitled to a missing witness charge as a matter of state law. The Second Circuit, recognizing "the usual aura of gamesmanship that frequently accompanies requests for a missing witness charge," has deferred to the trial court's judgment on this issue. *United States v. Torres*, 845 F.2d 1165, 1171 (2d Cir. 1988) (internal quotation marks omitted). Thus, in the particular area of "missing witness" adverse inference charges, a trial court's decision will rarely support reversal of a criminal conviction even on direct review. *Id.* On habeas review, "[t]he burden of demonstrating that an erroneous instruction was so prejudicial that it will support a collateral attack on the constitutional validity of a state court's judgment is even greater than the showing

-34-

required to establish plain error on direct appeal." *Henderson*, 431 U.S. at 153; *accord, e.g.*, *Castro v. Fisher*, No. 04 Civ. 0346, 2004 WL 1637920, at *17 (S.D.N.Y. July 23, 2004)). And, where the alleged error is one of omission, it "is less likely to be prejudicial than a misstatement of the law."*Henderson v. Kibbe*, 431 U.S. 145, 155 (1977). Moye has not met his "especially heavy," burden, *Henderson,* 431 U.S. at 153, on habeas review, of demonstrating that the court's refusal to issue a "missing witness" charge at his trial "so infected the entire trial that the resulting conviction violated due process.'" *Nieves v. Fischer*, No. 03 Civ. 9803, 2004 WL 2997860, at *8 (S.D.N.Y. Dec.28, 2004) (quoting *Henderson v. Kibbe*, 431 U.S. 145, 154 (1977) (quotation omitted)). Because it accordingly fails to raise an issue of federal constitutional dimension, *Henderson*, 431 U.S. at 154-55, Moye's missing witness claim cannot serve as the basis for federal habeas relief, *accord, e.g.*, *Nieves*, 2004 WL 2997860, at *8. *See also Reid v. Senkowski*, 961 F.2d 374, 377 (2d Cir.1992) (habeas relief may be granted only if petitioner can show that the missing witness charge deprived her of her constitutional right to a fair trial).

## V.     Conclusion

For the foregoing reasons, DeMario Moye's habeas corpus petition is denied. Because Moye has failed to make a substantial showing of the denial of a federal right, 5 28 U.S.C. § 2253(c)(2), I decline to issue a certificate of appealability.

**IT IS SO ORDERED.**

**/s/ Victor E. Bianchini**

_____
VICTOR E. BIANCHINI
United States Magistrate Judge

Dated: November 9, 2009
Buffalo, New York.